578 So.2d 1183 (1991)
Julian PICOU
v.
CIRCLE, INC. and Employers National Insurance Company.
No. 90-CA-791.
Court of Appeal of Louisiana, Fifth Circuit.
April 17, 1991.
*1185 Gordon Hackman, Ulmer Graydon Wilson, Boutte, for plaintiff/appellee.
Darryl J. Foster, Lemle & Kelleher, New Orleans, for defendants/appellants.
Before KLIEBERT, GAUDIN and GOTHARD, JJ.
GOTHARD, Judge.
In this worker's compensation suit the employer and compensation insurer appeal a partial judgment and a supplemental and final judgment in favor of the claimant. The plaintiff/appellee has answered the appeal.
Julian Picou, then thirty-five years old, sustained on July 30, 1981 a back injury while working as a millwright at Circle, Inc. Picou's injury was diagnosed as a ruptured disc and on May 3, 1982 he underwent surgery consisting of a laminectomy and spinal fusion at the L4-5 level. He has not returned to regular employment since the injury, has remained under the care of a physician, and has continued to complain of severe pain. Employers National Insurance Company paid him compensation at the maximum rate of $163.00 per week for 450 weeks in accordance with LSA-R.S. 23:1221(3) covering permanent partial disability. The insurer terminated benefits on April 3, 1990.
The plaintiff filed suit against Circle, Inc. and Employers National Insurance Company on December 8, 1982, alleging that the defendants had failed to provide and pay for adequate medical care and seeking compensation payments of $163.00 per week, *1186 payment of all overdue bills and authorization for treatment at the Mercy Hospital pain center. The insurer complied voluntarily in June, 1983, and Picou was admitted to the Touro pain clinic, whence the Mercy center had been moved, on July 7, 1983. Motions were filed by both sides over the years, among them the plaintiff's rule to compel payment of medical expenses and for sanctions, filed May 25, 1984. That matter was heard on August 2, 1984 and December 12, 1984. Post-trial memoranda were requested by the court and were filed, but the court apparently deferred judgment to trial of the merits. In May, 1990, a month after compensation benefits were terminated, the matter was set for trial.
On August 6, 1990 trial was held on the extent of Picou's disability, on whether the defendants were arbitrary and capricious in terminating benefits, and whether they had illegally delayed paying his medical expenses, subjecting themselves to sanctions. The court signed a partial judgment on August 13, 1990, holding that the plaintiff is permanently and totally disabled. It was ordered that the defendants pay benefits of $163.00 per week, retroactive to April 3, 1990; that a penalty of 12% along with legal interest be assessed on all past due installments; that the defendants pay an attorney's fee of $2,500.00 for the plaintiff's counsel's services toward reinstatement of compensation benefits; and that they issue guarantees to and make payment to the chronic pain unit and provide vocational rehabilitation to the plaintiff; all costs were assessed against the defendants.
In a supplemental and final judgment, signed on November 6, 1990, the court held that the defendants were "arbitrary and capricious in their handling of the medical aspects of the case over the years," specifically in failing to make timely payments on medical bills, drug bills, and for a brace, and refusing to authorize treatment at the pain unit. An additional attorney's fee of $5,000 for work pertaining to the medical aspects of the case was assessed. The defendants suspensively appealed both judgments timely. The plaintiff has answered the appeal.
The issues before this court are: (1) whether the manifest error rule may be applied to the court's ruling that the plaintiff is permanently and totally disabled and whether that finding is correct; (2) whether the defendants were arbitrary and capricious in terminating benefits after paying 450 weeks for permanent partial disability under the appropriate act; (3) whether the defendants were arbitrary and capricious in handling the medical aspects of the case; (4) whether the court erred in ordering the defendants to issue a guarantee to the pain clinic and to provide vocational rehabilitation services to the plaintiff; and (5) whether Circle, Inc. should be held arbitrary and capricious and penalized, when it had insured its compensation liability.
The appellee presents two issues: whether counsel for the plaintiff should have been permitted to testify on attorney's fees and whether the appeal is a frivolous one.

Extent of Plaintiff's Disability
We first address the question of whether the manifest error rule is applicable here. The appellants protest the court's having ruled from the bench, after a trial in which only one expert, the plaintiff's, testified. They allege that, "the court did not read any of the depositions of any of the physicians which were admitted into evidence" before rendering judgment. They argue that they are entitled to a fair and independent evaluation of the evidence by this court.
We cannot assume that the court did not consider the depositions of the other physicians, including the defendants' examiner. Furthermore, in Virgil v. American Guar. & Liability Ins., 507 So.2d 825 (La.1987), where all the evidence before the trier of facts consisted of written reports, records, and depositions, the Supreme Court overturned this court's holding that the manifest error standard did not apply and remanded the case for reconsideration. Accordingly, we hold that the manifest error standard applies to the court's findings of fact in this case, whether based upon live testimony or written evidence.
*1187 At the time of Picou's injury, LSA-R.S. 23:1221(2) provided compensation for permanent total disability as follows:
(2) For injury producing permanent total disability of an employee to engage in any gainful occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee, at the time of injury, was particularly fitted by reason of education, training and experience, sixty-six and two-thirds per centum of wages during the period of such disability.
In Johnson v. Ins. Co. of N. America, 454 So.2d 1113, 1117 (La.1984) the court set out the principles regarding disability because of pain as follows:
An employee who can only work in substantial pain may be totally disabled. Calogero v. City of New Orleans, 397 So.2d 1252 (La.,1980); Lattin v. Hica Corp., 395 So.2d 690 (La.,1981); and Martin v. H.B. Zachry Co., 424 So.2d 1002 (La.,1982). Plaintiff's uncontradicted evidence of pain can support a finding of substantial and appreciable pain. Dusang v. Henry C. Beck Builders, Inc., 389 So.2d 367 (La.,1980). The opinion of a physician or other medical expert about disability does not necessarily determine legal disability. Whitaker v. Church's Fried Chicken, Inc., 387 So.2d 1093 (La.,1980).
The pain accompanying routine tasks must be serious, intense, or severe. Wilson v. Ebasco Services, Inc., 393 So.2d 1248 (La. 1981).
Julian Picou testified that he experiences some degree of pain during all his waking hours. Its severity builds during the day from slight in the early morning to severe by noon. The longest he can be active is four hours, and he generally takes several breaks during any period of activity, lying down for one to three hours each afternoon. He does chores about the house and mows his own grass with a riding lawn mower. He had done carpentry before he became a millwright and has set up a shop in his garage, where he occupies himself with small woodworking projects, alternating sitting and standing. He is limited to lifting no more than twenty-five pounds but has adapted by using rollers to move heavier objects. He stated that he uses sleeping pills and muscle relaxers regularly and Tylenol as needed. Prior to the surgery he developed a severe neurogenic bladder problem for which he takes urecholine daily.
Dr. Richard Morse was the only live physician witness at trial, testifying as an expert in psychiatry and neurology. Dr. Morse is the director of the Touro Pain Center and testified from his summary of Picou's stay in the center in 1983 and from an update visit on July 19, 1990. He described Picou as appearing to be in pain in the recent visit:
... He walked very slowly. He showed grimacing and color changes of his face as he tried to move. He said he had not had, in recent years, had suicidal thoughts although he had back in 1983. He tends to isolate himself when he's in pain and feels very tense and tearful.... He has marked insomnia. In looking at the overall picture, thought he was showing residual pain from his fusion, and some residual nerve root pain....
Dr. Morse felt that, although Picou was able to perform activities of daily living, he was not able at that time to undertake competitive employment, whether light duty or part time.
Dr. Michael J. Marcello, Picou's treating physician, was accepted as an expert in family medicine and testified by deposition on June 22, 1990. Dr. Andrew G. King, Picou's surgeon, had referred him for maintenance care on November 23, 1984, and he saw him every three to four months to the time of the deposition. Dr. Marcello stated that his goal was to "moderate him in controlling his pain to a reasonable degree and moderating and controlling his level of daily activity to a reasonable degree..." Picou was then taking sinequan, an antidepressant, seconal, flexoril, urecholine, and vistaril, a hypnotic for relaxing and sleeping. Dr. Marcello felt that the drugs were necessary and without them *1188 Picou would be unable to perform any activity. Picou reported to him that whenever he ran out of medication he was in terrible pain. In Dr. Marcello's opinion, Picou was totally disabled and unable to fit into a work environment because of the limitations his pain placed on any sustained activity.
Dr. Andrew G. King, a member of the L.S.U. Medical Center's department of orthopedics, testified by deposition on June 21, 1990, and was stipulated to be an expert in orthopedic surgery. Dr. King began treating Picou in October, 1981, performed the surgery in 1982, and followed him through April, 1986. He saw Picou again on October 12, 1989, had an MRI performed, and felt there was no significant change from April, 1986, when in his opinion Picou had reached maximum medical improvement and no further surgery was indicated. However, he admitted that he could not measure Picou's pain. Although he felt that orthopedically Picou was able to do sedentary work, substantial pain was a possibility even in very sedentary work.
Dr. Terry L. Habig, accepted as an expert in orthopedic surgery, testified by deposition on July 24, 1990. He had examined the plaintiff for the defendants in January and April, 1982 prior to the surgery, and on November 17, 1986, September 7, 1988, and March 5, 1990. He testified that in 1986 he believed that Picou could return to sedentary work with restricted lifting and bending in a situation where he could alternate sitting, standing, and walking. Dr. Habig felt he had reached maximum medical improvement and, although the surgery had given him only slight relief from his symptoms, no further surgery was indicated. He assessed the disability of the body as a whole at 25% to 30%. The examinations in 1988 and 1990 showed little change from the 1986 visit, although the pain was a little less than before. At the last examination he still felt that Picou could tolerate sedentary work and that being occupied and productive would be beneficial to his orthopedic problems. He would expect him to have some pain in employment, just as he did in his everyday activities at home. He concluded by saying that he had no way of measuring pain, which is subjective, but felt that the plaintiff had had no deterioration from neurological and orthopedic standpoint since the surgery.
Ms. Judith Lide, accepted as an expert in vocational rehabilitation, testified at trial on her evaluation of Picou's employability. She had not interviewed him but had reviewed the medical reports, except for Dr. Marcello's, and had searched for and located several jobs that were available as of April 30, 1990 and were compatible with his physical and educational limitations. Upon cross examination by the plaintiff's counsel, she stated that the positions she had found required an eight hour work day, which would be unfeasible under Picou's current rest requirements.
We conclude from the evidence presented that Picou experiences substantial pain with any sustained activity, which makes him unable to compete in the labor market. The trial judge's finding that the plaintiff is permanently totally disabled is not erroneous.

Pain Clinic
The appellant contests the court's ordering the defendants to guarantee a second pain clinic admission, primarily because a written demand had not been made and that it is not "necessary" medical care under LSA-R.S. 23:1203. Having agreed with the judge's finding that pain is a significant cause of Picou's inability to be gainfully employed, we find that it was within his discretion to order medical treatment for handling the pain. Doctors Morse, Marcello, King, and Habig expressed concern over Picou's dependence upon medications, particularly seconal. Dr. Morse stated that the inpatient setting at the pain center would give him an opportunity to remove Picou from seconal and readjust the medication program, with the goal of increasing his tolerance for activity. Picou testified that he had made some progress in dealing with his pain during his 1983 stay. Dr. Morse opined that he should get along as well or better than the first time, as the fusion has matured and is stable. None of the physicians testified *1189 that a referral to a pain clinic was contraindicated, although the defendants' witness was skeptical of the chances for success. We find that the record overall supports the necessity for medical care relative to pain and that the judge's order for referral to the pain clinic was not an error.

Vocational Rehabilitation
The appellant correctly pointed out that the statutory provision for mandatory vocational rehabilitation was not enacted until 1983 and it is not required for workers whose injuries were incurred before the effective date. Rehabilitation, though generally desirable and beneficial, is not necessary medical or non-medical treatment under LSA-R.S. 23:1203(A). Koslow v. E.R. Desormeaux, Inc., 428 So.2d 1275 (La.App. 3rd Cir.1983). We therefore reverse and set aside that portion of the judgment in which the defendants are ordered to provide vocational rehabilitation.

Penalties and Attorney's Fees
Arbitrary and Capricious in Terminating Compensation
At the time of Picou's injury, LSA-R.S. 23:1201.2 provided for a penalty of 12% of the amount of the worker's claim plus reasonable attorney's fees when the insurer's discontinuance of compensation is determined to be arbitrary, capricious, or without probable cause. A succinct summary of the standards for making the determination appears in Willie v. Balehi Marine, Inc., 525 So.2d 231, 235 (La.App. 1st Cir.1988), as follows:
A termination of compensation will not be held to have been arbitrary or capricious where the insurance carrier bases its decision to terminate on competent medical evidence. Martin v. H.B. Zachry Co., 424 So.2d 1002 (La.1982). An insurer is required to make a reasonable effort to ascertain an employee's exact medical condition before benefits are terminated. Johnson v. Ins. Co. of N. America, 454 So.2d at 1117. The determination of whether an employer or insurer is arbitrary or capricious in terminating benefits is a question of fact not to be disturbed in the absence of manifest error. Marcel v. Craig Guidry Const. Co., 511 So.2d 48 (La.App.3d Cir. 1987).
If, after receiving an optimistic report of the employee's condition, the insurer later receives medical information indicating continuing disability, it has an obligation to investigate further or reinstate the benefits. Johnson v. Ins. Co. of N. America, supra.
Employers Insurance avers that its decision to terminate Picou's benefits was based upon competent medical evidence. At trial Ms. Elaine Farrell, the insurer's claims representative, testified that she and her supervisor decided to terminate after reviewing Dr. Habig's reports of November 18, 1986, September 14, 1988, and March 7, 1990, and that they felt it was a "four hundred and fifty week case," that is, a rating of permanent partial disability.
We reject the appellee's argument that as of April 30, 1990, when the vocational rehabilitation counselor's report was issued, the insurer was on notice that Picou could not engage in gainful employment. It was not until trial on August 6, when it was revealed that Picou's pain limited his activity to only a few hours a day with frequent rest periods, that the counselor's information was relevant. However, a careful review of Dr. Habig's reports indicates to us that the insurer should have consulted Picou's treating physician. In the 1988 and 1990 reports the doctor stated that Picou had continued to have pain in the lower back, wore a back brace most of the time, and was using several medications which were prescribed and monitored by his family doctor. In September, 1988, Dr. Habig's conclusion was:
It appears that Mr. Picou's symptoms are the same and I have really nothing new to state than what I did before, in that Mr. Picou is basically disabled from doing most work except very sedentary-type work, and that I feel that he has for all practical purposes, reached maximum medical improvement as I did back in 1986.
*1190 In March, 1990, his report stated, "It appears that Mr. Picou's condition is unchanged since when I last saw him." We find that the record supports the trial judge's finding that Employers National was arbitrary and capricious in terminating compensation and affirm his award of 12% interest on past due installments along with an attorney's fee of $2,500.
Arbitrary and Capricious Delay in Payment of Medical Claims
Prior to the 1983 amendment of the workers' compensation statute, the liability of the insurer for arbitrary and capricious failure to pay workers' medical claims within sixty days of receipt of proof and demand was covered by the general insurance statute, LSA-R.S. 22:658; a penalty of 12% damages on the amount of the claim plus reasonable attorney's fees is provided.
At the conclusion of trial, the court took under advisement and requested briefs on the issue of the insurer's failure to pay certain medical bills promptly and to provide medical treatment timely. On November 6, 1990 he signed a supplemental and final judgment, incorporating by reference the August 13 partial judgment. He ruled that the employer and insurer were arbitrary and capricious "in their handling of the medical aspects of the case over the years," specifically in:
1) Failure to make timely payments on medical bills, drug bills, and for a brace; and
2) Refusal to authorize treatment at the pain unit.
The appellants' primary contention is that counsel for the plaintiff has failed to produce competent evidence, both at trial and earlier at the December 12, 1984 hearing on his rule to compel payment of medical expenses.
The jurisprudence has held that, in order to recover penalties and attorney's fees he must show that the employer or insurer received written notice of a claim and that its failure to make payment was arbitrary, capricious, or without probable cause. Savoy v. McDermott, Inc., 520 So.2d 888 (La.App. 3rd Cir.1987). We agree, after reviewing the record thoroughly, that most bills and correspondence regarding payment were not introduced into evidence and were merely attached to pleadings, which does not suffice. Jackson v. Gordon, 381 So.2d 520 (La.App. 1st Cir. 1980).
We do find that the testimony substantiates the finding of delay in paying for the plaintiff's brace. Picou testified in the December, 1984 hearing that he wore a misfitting brace because the insurer insisted on having the old one repaired by replacing the brace's aprons, only later providing the replacement. He had gained weight since surgery, so that the brace was uncomfortable. Steve Perry, the then claims adjuster for Employers National, testified in an August, 1984 hearing that Picou was agreeable to their simply repairing the brace. The court chose to believe Picou.
The documents in evidence and the live and deposition testimony indicate that the insurer delayed authorizing the surgery itself and also, as the court found, delayed guaranteeing payment to the pain center, thus delaying Picou's treatment there until July, 1983.
Dr. King's reports, from October 13, 1981 to February 25, 1983, were stipulated and attached to his May 31, 1983 deposition. On February 22, 1982 Dr. King had Picou admitted to Hotel Dieu for testing, where a discogram showed a ruptured disc, and for study by a urologist. Picou had developed a serious urinary problem, a "neurogenic bladder," to the point of being unable to void. The bladder problem was attributed to pressure on the nerve roots and is a known result of a back injury; however, Dr. King stated that Picou's problem was "probably the most severe" that any of his patients had experienced. Dr. King's report to the insurer of March 31, 1982 detailed the results of the evaluation of Picou's back pain and the urological consultation. The report concluded:
It is my firm belief that Mr. Picou requires to undergo surgery which would require nerve root decompression and bilateral posterolateral fusion. I would *1191 like to do it as soon as possible, and request your permission to admit this man to hospital for the surgery.
Dr. Terry L. Habig, the orthopedist consultant for the defendant, testified that he had noted on January 29, 1982 that Picou's symptoms were suggestive of a ruptured disc and recommended a myelogram. Picou was referred for examination again on April 26, 1982, when surgery by Dr. King had actually been scheduled but cancelled at the insurer's request. Picou had been unable to urinate and a catheter had been inserted. Dr. Habig called the insurance company and said that he felt Picou should be hospitalized at once. In his written report to the insurer of that date he stated:
... On talking with the patient I am unsure whether he has had a cystometrogram performed by the urology doctor who has seen him for his incontinence. If this was performed and did show evidence of a neurogenic bladder, then the patient should have immediate exploratory laminectomy.... Since Dr. King has been treating them and has all the tests available, I have suggested that they go immediately to Hotel Dieu to be admitted to the hospital....
The insurer provided no explanation for the reexamination by Dr. Habig, when Dr. King had given the insurer full particulars of the evaluation, explaining that time was of the essence, and had requested permission for the surgery, which ultimately was performed on May 3. Mrs. Picou testified that despite the emergency, she was forced to sign a $12,000 promissory note when Picou entered the hospital because the insurer had not yet approved payment.
Although both parties expressed uncertainty as to which admission to the pain clinic was referred to in the supplemental and final judgment, it is clear from the transcript of the judge's comments at the end of trial that he took under advisement "whether or not the insurance company has been arbitrary and capricious, in failing to properly pay over the years, and that deals with the prior admission to the pain unit...."
Very early on in Dr. King's care of Picou he had recommended psychiatric therapy because of his extreme pain. He recommended the pain unit (then at Mercy Hospital) to the insurer on November 19, 1982 and stated in a chart note on December 17, 1982 that Picou was to be admitted early in January, 1983; Picou entered the Touro unit in July. Apparently as a result of the filing of this suit, the insurer agreed to the treatment in June but on appeal offers no explanation for its failure to authorize the admission sooner.
Accordingly, we concur in the court's finding that the insurer was arbitrary and capricious in its handling of the medical aspects of the case and affirm the award of an additional attorney's fee of $5,000 for work performed in collecting medical benefits.

Liability of Employer for Penalties and Attorney's Fees
As pointed out by the appellant, an employer who is insured for worker's compensation is not liable for penalties and attorney's fees. Charles v. Aetna Cas. and Sur. Co., 525 So.2d 1272 (La.App. 3rd Cir.1988), writ denied 531 So.2d 480 (La. 1988). For that reason we reverse both judgments insofar as they hold the employer, Circle, Inc., liable for penalties and attorney's fees.

Appellee's Issues
Finally, we dispose of the two issues raised by the appellees. As we have affirmed the judgments as to the finding that penalties and attorney's fees are due and the amounts of the attorney's fees were not appealed, the issue of counsel's right to testify concerning fees is moot.
We find that the appeal was not a frivolous one as the appellants raised serious questions of fact and law. They did not abuse the right to appeal.
Accordingly, for the reasons stated above, the partial judgment on the merits dated August 13, 1990 is reversed and set aside insofar as the judgment assesses against Circle, Inc. a penalty of 12% on overdue compensation benefits and an attorney's fee for the portion of the suit *1192 pertaining to reinstatement of worker's compensation benefits. It is reversed also insofar as it orders Circle, Inc. and Employers National Insurance Company to provide vocational rehabilitation to the plaintiff. In all other respects the judgment of August 13, 1990 is affirmed.
The supplemental and final judgment dated November 6, 1990 is reversed insofar as it decrees that Circle, Inc. was arbitrary and capricious in handling the medical claims and assesses against Circle, Inc. an additional attorney's fee for work pertaining to the medical aspects of the case. In all other respects the judgment of November 6, 1990 is affirmed.
Costs of this appeal are assessed against the appellant, Employers National Insurance Company.
AFFIRMED IN PART, REVERSED IN PART.